**IT IS ORDERED as set forth below:**



Date: June 26, 2007

_____
**Paul W. Bonapfel**
**U.S. Bankruptcy Court Judge**
_____

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| IN THE MATTER OF : | |
| : | CASE NUMBER: A06-70061-PWB |
| : | |
| KEVIN SCOTT KNIGHT, : | |
| : | IN PROCEEDINGS UNDER |
| : | CHAPTER 13 OF THE |
| Debtor. : | BANKRUPTCY CODE |

## ORDER

The Debtor's chapter 13 plan provides for the Debtor to make regular contractual payments of $455 per month on two nondischargeable student loans of approximately $50,000 under 11 U.S.C. § 1322(b)(5), which permits the maintenance of payments on long-term debts, including unsecured debts, and $400 per month to the Trustee for pro rata distribution to other unsecured creditors. The plan provides for these payments to be made for 60 months, the "applicable commitment period" under 11 U.S.C. § 1325(d)(4) for this Debtor whose "current monthly income" is above-median.

The chapter 13 Trustee objects to confirmation on the ground that, because of the direct payments on the students loan, the plan fails to commit all of the Debtor's "Projected Disposable Income" ("PDI") to payment of unsecured claims under the plan as § 1325(b)(1)(B) requires.

Without taking into account the payments on the student loans, the Debtor's PDI is $854.46. To satisfy § 1325(b)(1)(B) as the Trustee interprets it, the Debtor would have to pay this amount for 60 months, a total of $51,267.60. Because this leaves no money to make payments on the student loans, they would receive pro rata distributions like other unsecured creditors. The Debtor's unsecured debts, including the student loans, are approximately $105,800, so the pro rata distribution to unsecured creditors would be approximately 48 percent.

To enable the Debtor to continue making payments on the student loans as long-term debts, the plan proposes to pay only $400 per month ($854.46 less student loan payments of $450) for 60 months to the Trustee, a total of only $24,000. Excluding the student loans to be paid directly, the other unsecured claims are approximately $55,500. Thus, other unsecured creditors will receive distributions of approximately 43 percent under the Debtor's plan.

Because the Debtor has above-median income, § 1325(b)(3) requires determination of his "reasonably necessary" expenditures for purposes of determining his "disposable income" under § 1325(b)(2) by reference to the "means test" standards of 11 U.S.C. §§ 707(b)(2)(A) and (B), which also apply to determination of whether a presumption of abuse arises in a chapter 7 case that may warrant its dismissal. The Trustee asserts that the student loan payments are payments on debts that do not qualify as reasonably necessary expenditures under these standards. Therefore, the Trustee concludes, the Debtor's PDI is, $854.46, and the Debtor must pay this amount for 60 months to satisfy § 1325(b)(1)(B).

The Court concludes that the plan potentially complies with § 1325(b)(1)(B) for two reasons. First, even if the Debtor's PDI is $854.46 as the Trustee contends, the Debtor is paying all of it to unsecured creditors under the plan as § 1325(b)(1)(B) requires. Second, although the student loan payments do not qualify as a "reasonably necessary" expenditure under § 707(b)(2)(A)(ii)(I) in view of its specific exclusion of payments on debts, the circumstances surrounding the Debtor's student loans, including their nondischargeable nature,[1] may qualify as a "special circumstance" under § 707(b)(2)(B) that may justify a downward adjustment of PDI if the Debtor properly documents and explains them under § 707(b)(2)(B)(ii) and (iii).

### I. Application of Projected Disposable Income
### to Make Payments Under the Plan

Section 1325(b)(1)(B) provides:

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan –
>
> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

The Debtor's plan provides for the payment of $ 855 per month to unsecured creditors – $400 to holders of unsecured claims other than the student loans and $455 to holders of unsecured student

---

[1] Student loans are excepted from discharge under 11 U.S.C. § 523(a)(8) in the absence of a showing of undue hardship. Debts within this exception are excepted from a chapter 13 discharge. 11 U.S.C. § 1328(a)(2), (c)(2).

loans. Thus, even if the Debtor's PDI is $854.46, the plan meets the requirement of § 1325(b)(1)(B) that all PDI "be applied to make payments to unsecured creditors under the plan."

The Trustee's view requires a reading of § 1325(b)(1)(B) as requiring that all PDI be paid on a pro rata basis to all unsecured creditors. But the language in this provision does not address the allocation of payments among various types of unsecured creditors. To the contrary, another provision, § 1322(b)(1), which permits classification of unsecured claims, governs the allocation issue. Section 1322(b)(1) provides that a plan "may designate a class or classes of unsecured claims . . . but may not discriminate unfairly against any class so designated."

Section 1322(b)(5) permits a plan to provide for the curing of defaults and the continuation of payments while the case is pending "on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." This provision, then, expressly authorizes separate classification and different treatment of long-term unsecured debt. For § 1322(b)(5) to have meaning with regard to a long-term unsecured debt, § 1325(b)(1)(B) must permit the use of PDI to cure defaults and maintain payments on it.

The increase in the amounts that unsecured creditors would receive over 60 months if the plan treated all unsecured creditors the same way is *de minimis*. Thus, unfair discrimination as a result of this expressly authorized type of classification does not appear to be an issue in this case. In any event, the Trustee has not objected on this ground.[2]

The Court recognizes that bankruptcy practitioners use the term "payments under the plan" to mean "payments made by the chapter 13 trustee to creditors from payments a debtor makes to the

---

[2] A creditor holding two unsecured claims, eCast, withdrew its unfair discrimination objection.

trustee," thus distinguishing such payments from payments that a debtor makes directly to a creditor. In this sense, the payments on the student loans are not "under the plan." But whether a debtor makes payments as proposed in a plan to creditors directly or through distributions by the chapter 13 trustee from payments made by the debtor is immaterial. Direct payments made pursuant to a plan are "under the plan" because the plan provides for them.

Thus, even if the Debtor's PDI is $854.46 per month, the plan provides for all of it to be paid to unsecured creditors. It is not subject to objection under § 1325(b)(1)(B).

## II. ADJUSTMENT OF PROJECTED DISPOSABLE INCOME BASED ON STUDENT LOAN PAYMENTS

Even if the Court were to conclude, contrary to the foregoing ruling, that all PDI must be paid ratably to all unsecured creditors when an objection triggers § 1325(b)(1)(B), the plan is potentially confirmable if the Debtor properly documents and explains "special circumstances" that would justify a downward adjustment of PDI by the amount of the student loan payments.

Section 1325(b) defines "disposable income" in paragraph 2 but does not define "projected disposable income." In this case, however, "disposable income" is "projected disposable income" because there are no issues as to whether the Debtor's historical, current, and future incomes and expenditures differ. The only question here is whether the student loan payments may be taken into account in determining disposable income and, therefore, projected disposable income.

**A. Standards for Determining Projected Disposable Income Under § 1325(b) By Reference to § 707(b)(2)(A) and (B)**

As amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), new § 1325(b)(2) defines "disposable income" as "current monthly income" (a new term defined in § 101(10A)), less certain exclusions not material here, less "amounts reasonably necessary to be expended" for, among other things, maintenance and support of the debtor. For above-median income debtors, new § 1325(b)(3) requires determination of "amounts reasonably necessary to be expended" in accordance with § 707(b)(2)(A) and (B), which BAPCPA also added.

Section 707(b)(2) sets forth the mechanisms for calculating a debtor's income and expenditures for purposes of determining whether she has the ability to pay a statutorily specified amount of debt. The provisions are commonly referred to as the "means test." If an above-median income debtor's ability to pay exceeds the statutory threshold, abuse is presumed, and the court may dismiss the case or, with the debtor's consent, convert it to chapter 13. § 707(b)(1). (Such a debtor is usually said to have "failed" the means test because she may not be able to proceed in chapter 7 due to the presumption of abuse.)

Subparagraph A of § 707(b)(2) contains the standards for determining permissible expenditures that are taken into account in determining how much a debtor could pay and, consequently, whether a presumption of abuse arises. Subparagraph (B) then permits a debtor to rebut the presumption of abuse by demonstrating "special circumstances" under standards discussed below.

Application of subparagraph (A) in determining disposable income in a chapter 13 case is straightforward. An expenditure is a permissible deduction in determining chapter 13 disposable

income to the same extent that it is permissible in determining whether a presumption of abuse arises in a chapter 7 case. The Court's task here, therefore, is to determine whether the Debtor's student loan payments are permissible expenditures under subparagraph (A).

Application of subparagraph (B) in the chapter 13 context is not as simple. In a chapter 7 case, it permits a debtor to rebut a presumption of abuse that arises under the "means test" calculations of § 707(b)(2)(A) by demonstrating "special circumstances" that "justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." § 707(b)(2)(B)(i). If the additional expenditures cause the debtor's current monthly income less permitted expenditures to fall below the statutory threshold,[3] the presumption is rebutted. § 707(b)(2)(B)(iv).

Subparagraph (B) thus specifies standards under which a debtor may avoid the presumption of abuse in a chapter 7 case but does not by its terms deal with the issue of disposable income in a chapter 13 case. But the presumption of abuse is not a principle that applies in a chapter 13 case. In this regard, a debtor being in chapter 13, rather than chapter 7, is a remedy for abuse and, thus, a statutory objective of § 707(b)(2).

Nevertheless, the plain language of § 1325(b)(3) incorporates § 707(b)(2)(B) *in toto* and clearly makes the provision applicable to the determination of disposable income in a chapter 13 case. Because the determinative outcome of the means test calculations and of the disposable income calculations are similar in purpose and effect, subparagraph (B) should have an effect in a

---

[3]The resulting monthly amount is multiplied by 60 months. The presumption of abuse is rebutted if the resulting product is "less than the lesser of – (I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,000, whichever is greater; or (II) $10,000." § 707(b)(2)(B)(iv). The same threshold triggers the presumption of abuse if no special circumstances exist. § 707(b)(2)(A)(i).

chapter 13 case similar to its effect in a chapter 7 case.

As the popular term "means test" suggests, the purpose of the § 707(b)(2) provisions is to require debtors to pay their debts to the extent that they have the ability to do so. To this end, the statute prescribes standards for determining both the funds available to the debtor ("current monthly income") and statutorily permissible expenditures. Technically, § 707(b)(2) requires a number of calculations that result in a monthly available funds number, called "current monthly income" and average monthly permitted expenditures (taking into account obligations on secured and priority debts), which the statute does not define but can conveniently be called "monthly permissible expenditures." Monthly permissible expenditures are subtracted from current monthly income. The statute does not provide a term for this difference, but it can conveniently be called "monthly available income." The monthly available income is multiplied by 60 to arrive at an amount that the debtor could pay to unsecured creditors over five years. If this amount exceeds a statutorily prescribed amount – which for convenience may be called the "threshold amount," the statute's implicit rationale is that a debtor has the ability to pay at least a significant part of her unsecured debts, and it therefore results in a presumption that chapter 7 relief – which could fully discharge all of them – is an "abuse." If the court finds abuse, the remedy is dismissal of the case or conversion to chapter 13.

In connection with enactment of the "means test" to govern chapter 7 cases, BAPCPA also amended the projected disposable income test for chapter 13. The term "projected disposable income" is not new, but the amended definition of "disposable income" is. Under the prior law, "disposable income" was defined, simply, as "income which is received by the debtor and which is not reasonably necessary to be expended." Old § 1325(b)(2). Absent a change in this definition, a

debtor could "escape" the new means test calculations of chapter 7 through chapter 13. Accordingly, in order to enforce the "means test," chapter 13 had to be amended to require a debtor to pay creditors what the "means test" would require.

So the BAPCPA amendments to chapter 13 redefine disposable income to mirror, with some significant exceptions not material here, the outcome under the means test. Both the chapter 7 means test and the chapter 13 PDI test effectively apply only to a debtor with above-median income. When applicable, both tests begin with current monthly income (although a chapter 13 debtor may exclude certain support payments) and permit the same expenses. The difference between the two determines, in a chapter 7 case, whether a presumption of abuse arises or, in a chapter 13 case, the amount of disposable income. Both tests have the purpose of conditioning bankruptcy relief on payment of unsecured debts to the extent of a debtor's ability, and their calculations (aside from exclusion of support payments in some chapter 13 cases) yield substantially the same result – disposable income in a chapter 13 case and "monthly available income" (in this Order's terminology) in a chapter 7 case. Indeed, although § 707(b)(2) does not use the term "disposable income," the end result of its calculation is substantially the same as "disposable income" in a chapter 13 case.

It follows that § 707(b)(2)(B) should have the same effect in both chapters. In chapter 7, subparagraph (B) permits downward adjustments due to special circumstances to enable a debtor to avoid the presumption of abuse. As such, it recognizes that money for expenditures necessitated by special circumstances is not available to pay unsecured creditors. In a chapter 13 case, money for expenditures required by special circumstances is no more available to make payments to unsecured creditors than it is in a chapter 7 case. Consequently, disposable income may be adjusted downward to take account of them.

Section 707(b)(2)(B) requires consideration of expenditures that fall outside the permissible numbers and categories set forth in IRS standards as incorporated in subparagraph (A) if the expenditures are the result of "special circumstances." The direction in § 1325(b)(3) that reasonably necessary expenditures be determined in accordance with subparagraph (B) (as well as (A)) of § 707(b)(2) means that a chapter 13 debtor may show special circumstances to adjust disposable income to the same extent and in the same manner as a chapter 7 debtor may show them to rebut the presumption of abuse. *See In re Moore*, 2007 WL 1111267, at *3 (Bankr. D. Kan. Apr. 13, 2007) ("Section 1325(b)(3)'s incorporation of § 707(b)(2)(B) provides the Court with the ability to adjust both CMI and expenses . . . . Under this provision, the Court may consider a debtor's special circumstances in deviating from the formulaic determination under § 1325(b)(3).").

The Court rejects the proposition that § 707(b)(2)(B) operates only as a procedural mechanism to permit a debtor to rebut a presumption of abuse. Because a chapter 13 debtor has no occasion to rebut the presumption, which does not operate in a chapter 13 case, such an interpretation would take § 707(b)(2)(B) out of the disposable income determination, contrary to its express inclusion by § 1325(b)(3). It is counterintuitive to think that a debtor could avail herself of rebutting the presumption of abuse by showing a special circumstance expenditure to be qualified for relief in a chapter 7 case, but not have the opportunity to present the same circumstances to obtain chapter 13 relief.

**B. Application of the Standards of §707(b)(2)(A) and (B)**

Determination of whether the Debtor may deduct payments on his student loans for purposes of determining PDI in this case presents two questions. First, are the payments permissible expenditures under § 707(b)(2)(A)? Second, if not, do they qualify as "special circumstances" under

§ 707(b)(2)(B) that would permit their deduction in determining PDI?

*1. Deduction as permissible payments under § 707(b)(2)(A).*

Subparagraph A of § 707(b)(2) requires a debtor to use "applicable monthly expense amounts specified under the National Standards and Local Standards" issued by the Internal Revenue Service. National Standard expenses include food, clothing, household supplies, and personal care. Local Standard expenses include housing, utilities, and transportation. In addition, a debtor may deduct actual monthly expenses for the categories specified as "Other Necessary Expenses" by the IRS.

The issue here is the "Other Necessary Expenses" provision. The IRS includes student loans as one of several "Other Necessary Expenses" in § 5.15.1.10 of the IRS Manual.[4] The student loan payments thus qualify as "Other Necessary Expenses" that are allowable expenses under the IRS standards incorporated into the "means test" calculations in the first sentence of § 707(b)(2)(A)(ii)(I).

But they are also "payments for debts." And § 707(b)(2)(A)(ii)(I) expressly excludes "payments for debts" as qualified expenses with this sentence (emphasis added): "Notwithstanding any other provision of this clause, the monthly expenses of the debtor *shall not include any payments for debts*." The clear language of the statute, therefore, precludes deduction of the student loan payments as a "reasonably necessary" expenditure under § 707(b)(2)(A). *See, e.g., In re Delbecq,* 2007 WL 1408711, at *2 (Bankr. S.D. Ind. Apr. 26, 2007).

The Court thus concludes that the Debtor's student loan payments are not a permissible deduction from projected disposable income under § 707(b)(2)(A), applicable under § 1325(b)(3).

---

[4] Other expenses set forth in the IRS Manual are life insurance, health care, education expenses, dependent care, child care, support payments, job related involuntary deductions, charitable contributions, secured debt payment, unsecured debt payment, taxes, telephone services, internet service expenses, and amounts necessary to repay federal tax loans.

-11-

The Court thus turns to consideration of whether the payments are a deductible expenditure under § 707(b)(2)(B) due to "special circumstances."

*2. Deduction due to "special circumstances" under § 707(b)(2)(B).*

As set forth above, PDI for purposes of § 1325(b) may be adjusted downward to account for expenditures required by "special circumstances" within the meaning of § 707(b)(2)(B), applicable under § 1325(b)(3). Thus, the Court must consider whether the Debtor's proposed student loan payments of $455 per month qualify as "special circumstances."

Clause (i) of § 707(b)(2)(B) requires a debtor to demonstrate "special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances . . . justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative."

Clauses (ii) and (iii) of § 707(b)(2)(B) state the requirements for a debtor to claim a deduction based on special circumstances:

> (ii) In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide -
>
> > (I) documentation for such expense or adjustment to income; and
> >
> > (II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.
>
> (iii) The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.

Although Congress thus identified "serious medical condition or a call or order to active duty in the Armed Forces" as two instances that may constitute special circumstances, the term itself is

not exclusive to those factors, nor do they serve as a benchmark for defining special circumstances. *See In re Delbecq,* 2007 WL 1408711, at *3-4 (Bankr. S.D. Ind. Apr. 26, 2007). Section 707(b)(2)(B)(i) requires the debtor to demonstrate special circumstances that "justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative." As a number of courts have determined, the term "special circumstances" requires "a fact-specific, case-by-case inquiry into whether the debtor has a 'meaningful ability' to pay his or her debts in light of an additional expense or adjustment to income not otherwise reflected in the means test calculation." *Delbecq,* at *4. *Accord, e.g., In re Lenton,* 358 B.R. 651 (Bankr. E.D. Pa. 2006); *In re Tranmer*, 355 B.R. 234 (Bankr. D.Mont. 2006); *In re Thompson*, 350 B.R. 770 (Bankr. N.D. Ohio 2006). A special circumstance is one that, if the debtor is not permitted to adjust her income or expenses accordingly, results in a demonstrable economic unfairness prejudicial to the debtor.

In the context of chapter 7, three courts have found that a student loan payment may be a special circumstance. In *In re Haman*, 2007 WL 1175532 (Bankr. D. Del. Apr. 20, 2007), the bankruptcy court concluded that a nondischargeable student loan expense incurred by the debtor's son for which the debtor was a co-obligor and on which she made the payments due to her son's mental illness was a "special circumstance." Rejecting the U.S. Trustee's argument that a special circumstance must be involuntary in nature, the court concluded, "Nothing in the statute suggests or mandates that the 'special circumstances' be outside of the control of the debtor." *Haman*, at *5, *quoting In re Graham,* 2007 WL 685945, at *4 (Bankr. S.D. Ohio March 7, 2007). Because the court determined that the "only way the debtor can stop making the student loan payments would be to pay off the obligation in full, which the record indicates is impossible for this Debtor, or to have her son resume the monthly payments, which the record indicates would be unreasonable to

Case 06-70061-pwb    Doc 33    Filed 06/27/07    Entered 06/27/07 12:12:09    Desc Main
Document      Page 14 of 19

expect at this time due to his medical condition," the court permitted the expense as a special circumstance. *Haman*, at *7.

In *In re Templeton*, 2007 WL 886010 (Bankr. W.D. Okla. March 8, 2007), the court found that the debtors had "no reasonable alternative" to paying $425 per month on student loans of $72,000 because (1) the student loans were nondischargeable; (2) the loans were not eligible for consolidation; and (3) the debtors were not eligible for deferment of the student loans. As such, the court concluded, "[T]here is nothing within the Debtors' power to reduce or otherwise avoid the additional expense of the student loans." *Id.* at *2.

In *In re Delbecq*, 2007 WL 1408711 (Bankr. S.D. Ind. Apr. 26, 2007), the chapter 7 debtor had student loans totaling about $21,000 with interest at nine percent. Her monthly payment at the time of filing, based on a brief deferral, was $327, but it was to return shortly to the regular monthly payment of $350. The court found that, because of the student loan payment, the debtor had no meaningful ability to pay her debts and that she had no reasonable alternative to making the payments. In this regard, the court observed that, if the case were dismissed, she would likely have to defer payment of her student loans to pay her other unsecured debts, which would result in additional indebtedness in the form of nine percent interest on the student loan debt. The court concluded that it was not a reasonable alternative for the debtor to pay her credit card debt instead of making student loan payments because it would take her years to satisfy the credit card debt and she would end up owing substantially more in student loans. *Id.* at *4. Thus, the court ruled that the debtor had demonstrated special circumstances to rebut the presumption of abuse.

This Court likewise concludes that a student loan payment may qualify as a "special circumstance" warranting inclusion as an expense and deduction from a debtor's projected

disposable income. As any parent or student can attest, the expense of higher education, whether public or private, is beyond the means of many without financial assistance, often backed and guaranteed by the government. Public policy encourages the pursuit of higher education because it benefits not only the individual, but society as a whole. To that end, student loans are available for those of all means and backgrounds. Because the price of education is often so high, an individual can exit a university owing tens, if not hundreds, of thousands of dollars. It is not uncommon for student loans to be structured for repayment over periods ranging from ten to 30 years. Importantly, student loans are excepted from discharge in bankruptcy unless the debtor can establish the extremely high burden of "undue hardship." 11 U.S.C. § 523(a)(8).

These characteristics render student loan debt unique and qualify it for consideration as a special circumstance because of the likelihood that a debtor may have no reasonable alternative to continuation of the payments in order to avoid unfair economic harm.

The Debtor in this case receives a one percent reduction in interest based upon the direct debit of his payments from his checking account. Requiring the Debtor to cease the direct payment will result in loss of the benefit of the interest rate reduction. Moreover, the payment of student loans in the chapter 13 plan at less than the contractual payment may result in an accrual of interest over the five year life of the plan that may subject the Debtor to the seizure of tax refunds or garnishment, or to a requirement that he pay the accrued interest in a lump sum upon completion of the plan. Forcing the Debtor to default on the long-term student loan debt with economic consequences that may well leave him in continued financial distress upon his completion of his plan makes chapter 13 relief illusory by impairing, if not eliminating, his fresh start.

Congress could not have intended either the "means test" in chapter 7 or the "projected

disposable income" provisions in chapter 13 to have such a result. Considered together, these provisions – particularly the adoption of objective standards for determination of "reasonably necessary" expenditures for debtors with above-median incomes – evidence a clear Congressional purpose to require individuals with consumer debts to adjust their lifestyles to pay what they can afford. The provisions demand that a debtor commit discretionary income to pay debts rather than to maintain an existing lifestyle. *See In re Delbecq,* 2007 WL 1408711, at *3-4, *6 (Bankr. S.D. Ind. Apr. 26, 2007) (discussing legislative history and Congressional intent).

A debtor's desire to continue to make payments on long-term, nondischargeable student debt represents neither a lifestyle choice nor a use of discretionary income that should be directed in a different way. A debtor in such circumstances has no realistic choice, and the required payments do not in any true sense represent discretionary income. To the contrary, paying a substantial nondischargeable student loan is an economic and legal necessity.

Indeed, confirmation of the Debtor's plan may be the only effective bankruptcy relief that he can obtain. There is no dispute that, based on his income, the operation of the means test of § 707(b)(2) would trigger a presumption of abuse (even if the student loan payments could be deducted under § 707(b)(2)(B) due to special circumstances) that could preclude chapter 7 relief. If the Debtor's plan must commit $854.46 per month to unsecured creditors to be confirmable, he will not have enough money to continue regular payments on his student loans. So he would be between a rock and a hard place. His only two alternatives would be proceeding with such a chapter 13 plan or not pursuing bankruptcy relief. In the former situation, he would have to deal with the consequences of default on his student loan upon completion of plan payments in five years. In the latter situation, he could either continue making payments on his student loans but would have no

way of dealing with other creditors, or he could pay other creditors, resulting in student loan defaults. None of these is a reasonable alternative to continuation of his regular student loan payments. *See In re Delbecq, supra.*

Given that the purpose of incorporating § 707(b)(2)(A) and (B) into § 1325(b)(3) is to determine an above-median debtor's ability to pay "projected disposable income," it is illogical to ignore the economic and legal necessity of paying a substantial nondischargeable student loan. The provision permitting adjustment to income for student loan expenses as a special circumstance permits consideration of economically unusual circumstances for which there is no reasonable alternative. There is no dispute that based upon his income the Debtor faces a presumption of abuse that could preclude a chapter 7 discharge. There is no dispute that, regardless of whether the student loan is allowed as an exceptional circumstance, this Debtor must commit his disposable income for a 60 month applicable commitment period.

As one judge has wisely observed, "[I]f Chapter 13 is the required alternative to Chapter 7, it should be a remedy that works." *In re Webb*, Case No. 06-61821-MHM (Bankr. N.D. Ga. Feb. 22, 2007) (slip op. at 13). This Court concurs. Making chapter 13 work requires that a debtor with substantial, long-term, nondischargeable student loan obligations be able to deal with those obligations in a reasonable way in a chapter 13 case. The price of chapter 13 relief should not be the creation of yet another default situation and unavoidable financial distress at the end of the chapter 13 case on account of debts legitimately incurred and in fact encouraged as a matter of public policy.

Based on these considerations, the existence of long-term, nondischargeable student loans may constitute a "special circumstance" requiring the continuation of regular payments as expenditures for which there is no reasonable alternative within the meaning of § 707(b)(2)(B).

Clauses (ii) and (iii) of § 707(b)(2)(B) require the debtor to document and explain the expenditures for student loan payments, to provide a detailed explanation of the special circumstances that make them necessary and reasonable, and to "attest under oath" to the accuracy of any information provided.  If the Debtor satisfies this evidentiary burden, the application of § 707(b)(2)(B), by its incorporation under § 1325(b)(3), permits the downward adjustment of PDI to take the student loan payments into account.[5]

The record does not contain the attestation required to invoke the special circumstances provisions of § 707(b)(2)(B).  The Court will require the Debtor to file, within 20 days from the date of this Order,  (1) documentation to establish his present payments to the student loan creditors and a detailed explanation of the special circumstances that make such expenses reasonable and necessary; and (2) an affidavit attesting to the accuracy of the information.  The Trustee may file an objection and request for an evidentiary hearing within 10 days of the Debtor's filing.  If the Trustee does not timely file an objection and request for an evidentiary hearing,  the Court will deem the Debtor's evidentiary burden satisfied.

### III. Conclusion

In conclusion, the Court concludes that, even if the Debtor's  PDI is $854.46 as the Trustee contends, the Debtor is paying all of it to unsecured creditors under the plan as § 1325(b)(1)(B) requires.  Even if § 1325(b)(1)(B) requires that all PDI be paid ratably to all unsecured creditors, the

---

[5] A practical issue for invoking the "special circumstance" adjustment is how to do so.  There is no provision for such in the formulaic Form 22C and a debtor should not include it as an "Other Expense" on line 59.  It would seem appropriate for the debtor (1) to complete Form 22C (which will not reflect the special circumstance adjustment), (2) to complete Schedules I and J to reflect the special circumstance adjustment and, therefore, the disposable income which will be devoted to the Debtor's plan, and (3) as a separate document, to file the affidavit and documentation required by § 707(b)(2)(B)(ii) and (iii).

Court concludes that, although the student loan payments do not qualify as a "reasonably necessary" expenditure under § 707(b)(2)(A)(ii)(I) in view of its specific exclusion of payments on debts, the circumstances surrounding the Debtor's student loans, including their nondischargeable nature, may qualify as "special circumstances" under § 707(b)(2)(B)(i) that may justify a downward adjustment of PDI if the Debtor properly documents and explains them under § 707(b)(2)(B)(ii) and (iii). In order to perfect the record on all issues, the Court will require the Debtor to file an affidavit in accordance with § 707(b)(2)(B)(ii) and (iii) so that the Court may consider whether the special circumstances provision applies in this case. The Trustee may object to the affidavit or request an evidentiary hearing.

Based on, and in accordance with, the foregoing, it is hereby **ORDERED** as follows:

1. Within 20 days of the entry date of this Order, the Debtor shall file (a) documentation to establish his present payments to the student loan creditors and a detailed explanation of the special circumstances that make such expenses reasonable and necessary; and (b) an affidavit attesting to the accuracy of the information.

2. The Trustee may file an objection and request for an evidentiary hearing within 10 days of the Debtor's filing. If the Trustee does not timely file an objection or request for an evidentiary hearing, the Court will deem the Debtor's evidentiary burden satisfied and will enter an order confirming the Plan.

END OF DOCUMENT